**UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF NEW YORK**
------------------------------------------------------------X
GEORGE ANTON JACHOWDIK,

                             Plaintiff,

         -against-

COMMISSIONER OF SOCIAL SECURITY,

                          Defendant.
------------------------------------------------------------X

**REPORT AND**
**RECOMMENDATION**

CV 18-2361 (JMA) (AKT)

**A. KATHLEEN TOMLINSON, Magistrate Judge:**

I.     <u>PRELIMINARY STATEMENT</u>

       Plaintiff George A. Jachowdik (the "Claimant" or "Plaintiff") commenced this action

pursuant to the Social Security Act (the "Act"), 42 U.S.C. § 405(g) *et seq.*, against Defendant

Nancy A. Berryhill, in her capacity as Acting Commissioner of the Social Security

Administration (the "Commissioner" or "Defendant"). *See generally* Complaint ("Compl.")

[DE 1]. Plaintiff appeals the final administrative decision of the Commissioner denying his

request for disability benefits. *See generally id.*

       The parties filed cross-motions for judgment on the pleadings, pursuant to Rule 12(c) of

the Federal Rules of Civil Procedure. *See* Plaintiff's Notice of Motion for Judgment on the

Pleadings [DE 14]; Defendant's Notice of Cross-Motion for Judgment on the Pleadings [DE 22].

Judge Azrack referred the parties' cross-motions to this Court for a Report and Recommendation

as to whether either motion should be granted, and if so, what relief should be ordered. *See*

December 21, 2020 Electronic Order. For the reasons which follow, the Court respectfully

recommends to Judge Azrack that: (1) Plaintiff's motion for judgment on the pleadings be

DENIED; (2) Defendant's motion for judgment on the pleadings be GRANTED.

## II.   BACKGROUND

### A.   Procedural History

On March 6, 2014, Plaintiff applied for Social Security disability insurance benefits ("DIB").  *See* Administrative Transcript ("Tr.") [DE 24] at 68, 152-156.  Plaintiff alleged a disability beginning January 1, 2010 due to the following medical conditions:  (1) herniated spine; (2) carpal tunnel syndrome; (3) chronic obstructive pulmonary disease ("COPD"); (4) high blood pressure ("HBP"); (5) heart stents; (6) pain in limbs; and (7) arthritis.  *Id.* at 67-69, 152, 150.  After conducting an initial review, the Social Security Administration (the "SSA") denied Plaintiff's application for DIB on October 27, 2014.  *Id.* at 71, 87-90.  Plaintiff then requested a hearing before an Administrative Law Judge ("ALJ").  *Id.* at 67, 73-76, 85-86.  The hearing was conducted on December 9, 2016 before Alan B. Berkowitz, the presiding ALJ.  *Id.* at 22-57.  On June 13, 2017, ALJ Berkowitz determined that Plaintiff was not disabled from January 1, 2010 to March 31, 2013, the period for which he was last insured.  *Id.* at 8-21.  Plaintiff requested that the Commissioner's Appeals Council review the ALJ's decision.  *Id*. at 150.  The Appeals Council denied Plaintiff's request for a review on March 22, 2018, which rendered the ALJ's decision the "final decision" of the Commissioner.  *Id.* at 1-7, 151.

Plaintiff commenced the instant action on August 21, 2017 seeking judicial review of the Commissioner's final decision, pursuant to Section 205(g) of the SSA, as amended, 42 U.S.C. § 405(g).  *See generally* Compl.  On May 16, 2019, Plaintiff moved for judgment on the pleadings.  *See* Plaintiff's Memorandum of Law in Support of Motion for Judgment on the Pleadings ("Pl.'s Mem.") [DE 15].  The Commissioner cross-moved for judgment on the pleadings.  *See* Defendant's Memorandum of Law in Support of Cross-Motion for Judgment on the Pleadings ("Def.'s Mem.") [DE 22-1].  Neither party submitted responses to one another's

moving papers. Thereafter, Judge Azrack referred the matter to this Court for a Report and Recommendation as to whether either motion should be granted. *See* December 21, 2020 Electronic Order.

### B.    Medical Evidence

#### 1.    *Treatments and Examinations in 2010*

On April 6, 2010, the Plaintiff sought treatment at Stony Brook Hospital for chest pain and tightness. Tr. at 350-53, 382-87. Plaintiff stated that he had been drinking "a couple of six packs" per day and was using methadone recreationally. *Id*. at 382-83. The medical professionals at Stony Brook diagnosed the Plaintiff with coronary artery disease, as well as ventricular tachycardia, angina pectoris, alcohol dependence, tobacco use, and hypertension. *Id*. at 351, 367. Following a positive stress test, a diagnostic catheterization was performed. *Id*. at 351, 353, 364-375. A cardiac catheterization showed double vessel coronary artery disease. *Id*. at 367. Plaintiff received coronary artery and vascular stents. *Id*. He was discharged the same day. *Id*. at 350-56. In addition to being counseled regarding alcohol and substance abuse, Plaintiff was advised to stop smoking and drinking alcohol. *Id*. at 358, 360. Plaintiff was also advised that he could return to work after being seen by his cardiologist on April 28, 2010. *Id*. at 360.

#### 2.    *Treatments and Examinations in 2013*

On September 1, 2013, Plaintiff sought treatment for abdominal pain at Stony Brook Hospital. *Id*. at 471-672. He stated that he had been drinking one liter of vodka per day and using methadone. *Id*. at 481, 498, 523, 528-30. The medical professionals at Stony Brook noted "some depression" but found that Plaintiff had clear lungs and no shortness of breath ("SOB"). *Id*. at 481-82, 498, 526, 532. He was alert and fully oriented and did not exhibit any signs of

pain in the abdomen during the intake examination. *Id.* A CT scan of Plaintiff's lungs showed mild emphysema. *Id.* at 613. Neuromuscular examination showed his upper extremity strength to be normal and his sensation intact. *Id.* at 551-54.

Plaintiff was discharged on September 2, 2013 with a diagnosis of constipation and instructed to schedule a colonoscopy and a follow-up CT scan of his chest for surveillance of a pulmonary nodule. *Id.* at 496-501, 527, 535-37. Treatment notes reflect that Plaintiff had been prescribed Plavix (clopidogrel), an anti-coagulant; Metoprolol, a beta-blocker; Norvasc (amlodipine), a drug to dilate blood vessels; Enalapril, an angiotensin converting enzyme (ACE) inhibitor, used to treat high blood pressure; and hydrochlorothiazide, a diuretic. *Id.* at 457.

### 3.    *Treatments and Examinations in 2014*

The Plaintiff was taken to Stony Brook Hospital's psychiatric ward on January 27, 2014, after calling the police and stating that he had been drinking and taking oxycodone and wanted to die. *Id.* at 462, 948-49, 955, 975, 977-979, 1016-17, 1035. Plaintiff stated he had been attempting to wean himself off his recreational use of methadone, oxycodone and alcohol, but resumed his drug and alcohol use because he had not been able to sleep for approximately three days. *Id.* at 462, 975, 979-80. He had been drinking a quart of vodka per day and had taken oxycodone the previous night. *Id.* at 962-65, 1017. Once sober, the Plaintiff admitted that his statement about wanting to die was made without intent or plan. *Id.* at 962-64.

Plaintiff reported chest pain during admission. *Id.* at 1019. An electrocardiogram ("EKG") was taken which showed normal results, along with a chest x-ray which showed unremarkable results. *Id.* at 1006-09. Plaintiff's chest pain was assessed as typical, resolving with time. *Id.* at 459-61, 464, 1019, 1023. Travis Bench, M.D., Plaintiff's cardiologist, informed the Stony Brook doctors that cardiac treatment was not necessary. *Id.* at 466.

4

Plaintiff's physical examination was unremarkable and Plaintiff was cooperative and displayed normal mood and affect. *Id*. at 464. Plaintiff was assessed as having suicidal ideation, chest pain, and polysubstance dependence, including episodic opioid type drug abuse, and acute alcohol intoxication. *Id*. at 459. He was discharged the following day, with a referral for alcohol and substance abuse treatment. *Id*. 467, 966-68.

Plaintiff returned to Stony Brook Hospital on February 6, 2014, reporting chest pain and shortness of breath and again noted he had been using alcohol. *Id*. at 744-50, 755-56, 769, 784, 786, 943-947. He was not in acute respiratory distress and had no difficulty speaking,although he reported he could not breathe. *Id*. at 750. He was treated for acute alcohol intoxication. *Id*. at 789. A chest x-ray, taken on February 7, 2014, showed normal results, with clear lungs and cardiac size within normal limits. *Id*. at 873. An electrocardiogram, however, showed an anteroseptal infarct. *Id*. at 875-76. On February 8, Plaintiff had non-labored respirations and mild wheezes bilaterally, normal cardiovascular sounds, and normal neurological signs. *Id*. at 787, 791-92. He left the hospital that day, against medical advice, noting he felt "much better," and received a discharge diagnosis of obstructive chronic bronchitis with acute exacerbation and acute alcohol intoxication. *Id*. at 746, 752, 769, 791.

On February 25, 2014, Plaintiff saw Henry Moreta, M.D., a neurologist to whom he reported a 40- year history of neck pain following a diving accident. *Id*. at 273-80, 333-40. Dr. Moreta reviewed a recent neck x-ray showing C3-C4 level compression deformity with bridging. *Id*. at 273, 306-07. Physical examination findings were within normal limits. *Id*. at 278-79. Plaintiff's respiratory examination was unremarkable -- showing clear lungs -- and his cardiovascular examination showed a regular heart rate and rhythm, without evidence of edema. *Id*. at 278. Plaintiff also retained normal gait, normal mobility, normal bilateral shoulder function

and normal curvature of the thoracic and lumbar spine, without tenderness, although he had muscle spasm and a mildly reduced range of motion of the cervical spine. *Id*. at 278-79. A neurological examination was likewise unremarkable, with Plaintiff retaining normal sensation, cranial nerve function, motor strength, reflexes, motor skill, balance and gait. *Id*. at 279. Dr. Moreta assessed cervicobrachial pain; a history of cervical spine fracture with transient paraplegia; brachial neuritis or radiculitis; cervical spondylosis without myelopathy; cervicobrachial syndrome; and a closed fracture of an unspecified part of the vertebral column. *Id*. at 280. He prescribed Neurontin, an anti-seizure drug used for nerve pain, and Spiriva, a medication for asthma and COPD. *Id*. at 273-74.

Electromagnetic/nerve conduction velocity ("EMG/NCV") tests performed on March 17, 2014 showed moderate entrapments to the median nerves at the wrist, such as moderate bilateral carpal tunnel syndrome, resulting in mild sensory axonal degeneration on the right, mild chronic axonal motor degeneration on the left, and possible chronic C7 radiculopathy. *Id*. at 281-87, 300-03, 341-47.

On March 20, 2014, Plaintiff returned to Dr. Moreta. Tr. 268-72, 308-12, 328- 32. Dr. Moreta reviewed an MRI, previously taken on March 12, 2014, which showed severe osteophyte at C5-C6, with spinal cord compression and spinal cord gliosis. *Id*. at 268; 288-89. Plaintiff was not in acute distress and retained normal gait and balance during the examination. *Id*. at 271-72. His neck impairment had worsened, showing a severely reduced range of motion and tenderness on palpation. *Id.* Plaintiff also exhibited worsening of the thoracic and lumbar spine, which now had a reduced range of motion compared to Dr. Moreta's examination of February 25. *Id*. at 271-72. Plaintiff demonstrated normal attention and concentration. *Id*. at 272. Dr. Moreta diagnosed "bilateral cervical radiculopathy with severe cervical spondylosis stenosis disc

herniation spinal cord damage associated bilateral carpal tunnel;" radiculopathy cervical; and carpal tunnel syndrome.  *Id.*  Dr. Moreta prescribed Plaintiff hydrocodone for pain.  *Id*. at 268-69.

On May 1, 2014, Assistant Nurse Practitioner ("ANP") Patricia Grant performed a neurological evaluation on the Plaintiff.  *Id*. at 263, 323-27, 1087-91.  Plaintiff reported a 40-year history of cervical radicular pain following an accident, requiring extensive treatment and some residual pain, though "he went on to live a productive life as a brick layer[sic]."  *Id*. at 263. Following stenting, Plaintiff's cardiac condition was maintained with Plavix.  *Id.*  Physical examination was normal.  *Id.*  Neurological examination, likewise, was normal, with the Plaintiff maintaining normal sensory function and strength of the bilateral upper extremities.  *Id*. at 266-67.  ANP Grant prescribed Norco, a combination of acetaminophen and hydrocodone.  *Id*. at 263-64.

At a follow-up examination with ANP Grant on June 19, 2014, the Plaintiff reported axial pain.  *Id*. at 259-62, 1083-86. ANP Grant's findings were unchanged and within normal limits, except for severe restriction in cervical range of motion related to the C4-C6 levels.  *Id*. at 261-262,1085-86.

At the Plaintiff's next appointment with ANP Grant, on September 4, 2014, he stated that he had been living at his vacation home in upstate New York.  *Id*. at 254-58, 1078-82. ANP Grant found no change in Plaintiff's physical condition.  *Id*. at 254.  She reported that the Plaintiff declined surgical treatment, and noted that his medication "remained effective and well-tolerated."  *Id*. at 254, 1078.

On October 8, 2014, Plaintiff returned to Stony Brook Hospital where his cardiologist, Dr. Bench, performed a diagnostic catheterization.  *Id*. at 678-743.  Plaintiff reported that he

continued to smoke and that he had consumed 10 beers the night before the treatment. *Id*. at 682, 716-17.  Cardiac catheterization showed normal systolic function of the left ventricle and non-obstructive coronary artery disease. *Id*. at 690-692.  Dr. Bench diagnosed coronary artery disease and recommended dietary changes. *Id*. at 713.  He advised the Plaintiff to ambulate as tolerated, but did not impose any weight-bearing restrictions. *Id.*

On December 24, 2014, the Plaintiff returned to ANP Grant. *Id*. at 250-53. She found Plaintiff's condition was stable, noting that he only required pain medications some days. *Id*. at 250.  Plaintiff was severely restricted in flexion, extension and lateral bending. *Id*. at 252.  ANP Grant reported that the Plaintiff's "quality of life [was] relatively good" and that he was "satisfied with his situation." *Id.*  Plaintiff declined surgical evaluation. *Id.*

### 4.      *Dr. Shaikh's Medical Source Statement*

Dr. Shaikh, the Plaintiff's treating pulmonologist, completed a physical medical source statement on July 13, 2015 based upon her treatment of Plaintiff for COPD. *Id*. at 291-94.  She stated that the Plaintiff's prognosis was fair and that his symptoms, including coughing, weakness and shortness of breath, were exacerbated by smoking, weather, dust and cement. *Id*. at 291.  According to Dr. Shaikh, Plaintiff could sit for two hours at a time, stand for one hour at a time, and tolerate either activity for less than two hours in a workday. *Id*. at 292.  Dr. Shaikh estimated that Plaintiff could occasionally lift up to 20 pounds, could occasionally twist and stoop and rarely crouch and/or squat, climb ladders or climb stairs, but had no significant limitations with reaching, handling or fingering. *Id*. at 294.

Dr. Shaikh stated the Plaintiff would need to take unscheduled breaks during the workday due to chronic fatigue. *Id*. at 292.  She did not state how long she had been treating Plaintiff or

the period of time to which her description of the Plaintiff's symptoms and limitations applied. *Id*. at 291, 293.

### 5.    *Dr. Bench's Medical Source Statement*

Dr. Bench also completed a physical medical source statement received on July 24, 2015 regarding the Plaintiff's cardiac conditions. *Id*. at 295-99. Dr. Bench stated that he had been treating the Plaintiff for the past 10 months. *Id*.; *but see id*. at 466 (Stony Brook treatment note from January 27, 2014, referring to a consultation in the emergency room with a "[p]rivate cardiologist covering for Dr. Bench"). He identified the Plaintiff's symptoms as exertional dyspnea, paroxysmal nocturnal dyspnea, rest dyspnea and orthopnea. *Id*. at 296-97. Plaintiff was diagnosed with coronary artery disease, COPD, and hypertension with a good prognosis. *Id*. at 296.

Dr. Bench opined that Plaintiff was incapable of performing even low-stress work based upon his COPD and shortness of breath. *Id*. at 297. He could not at that time determine whether Plaintiff's condition would last 12 months. *Id*. Dr. Bench did not assess Plaintiff's ability to sit, stand, walk, lift, carry, perform postural activities or tolerate environmental irritants during a workday. *Id*. at 297-98. He that Plaintiff did not have any cardiac limitations. *Id*. at 298.

### C.    Vocational and Non-Medical Evidence

#### 1.    *Plaintiff's Testimony*

At the December 9, 2016 hearing, Plaintiff testified that he was 56 years of age at the date he was last insured. *Id*. at 31. He completed the eighth grade and had not earned a GED. *Id*. at 31-32, 206. Plaintiff stated that he could read and write in the English language and perform simple math. *Id*. at 32. He worked as a bricklayer from 1986 through 2009, and stopped working after he had a heart attack in 2010. *Id*. at 33, 47, 50-51, 157-70, 206, 217-22.

Plaintiff reported that he had not worked since his heart attack in 2010. *Id*. at 34. Although he had been hospitalized for only a few days following the heart attack, he testified that he did not feel well for months afterward. *Id*. at 33. He did not attend cardiac therapy but was prescribed medication, including nitroglycerine tablets, which he took once or twice a week for chest pain in 2010. *Id*. at 34. Plaintiff testified that he had difficulty walking due to his shortness of breath, but had no trouble sitting or standing. *Id*. at 36-37.

According to Plaintiff, he was primarily incapable of working since 2010 due to COPD and emphysema, which he stated was first diagnosed in February 2013. *Id*. at 32-33. His emphysema caused shortness of breath which made it difficult to walk up and down stairs and walk for long periods of time. *Id*. at 33. Although Plaintiff experienced shortness of breath, he testified that he did not stop smoking cigarettes until 2015. *Id*. He had also experienced trouble lifting due to constant pain in his neck and arms. *Id*. at 35-36. Plaintiff said that he had experienced this pain "all [his] life," noting that he had fractured his neck when he was younger, but that it worsened around 2012. *Id*. at 35-37, 42-45. The pain "would come and go," and pain in his hands and wrists had sometimes prevented him from working. *Id*. at 36, 44-45. On occasion, he would feel numbness in his arm and hands which made it difficult to use them. *Id*. He did not obtain any treatment for this condition until 2014 when he first saw a neurologist. *Id*. at. 36.

Plaintiff testified that he takes pain medication, hydrocodone, three times a day for the pain in his neck, arms, and hands. *Id* at 39, 188. The medication takes the edge off his pain, but depletes his energy. *Id*. at 45-46. Plaintiff had trouble falling asleep at night and is unable to sleep more than two hours at a time. *Id*. at 46. His inability to sleep started a "very long time" ago. *Id*.

During the period from 2010 through 2013, Plaintiff testified that the only physician he saw regularly was his cardiologist, whom he identified as Dr. Bench. *Id*. at 39-40; *but see id*. at 295-99, 466 (indicating Dr. Bench began treating Plaintiff in 2014).  Plaintiff stated that Dr. Bench told him he did not have any cardiac impairment but advised him not return to work as a bricklayer. *Id*. at 41-42.  Dr. Bench did not otherwise recommend any restrictions on lifting or carrying. *Id*. at 42.

Plaintiff testified that he was capable of lifting 20 pounds on a regular basis, and 30 or 40 pounds occasionally. *Id*. at 51-52.  He was not aware of any other work he could perform that would use the skills he had developed as a bricklayer. *Id*. at 52.

Plaintiff stated that he lives with his son and daughter-in-law on the second floor of their house. *Id*. at 32, 38.  His daughter-in-law does all the housework and meal preparation. *Id*. at 38.  Plaintiff shops once in a while, for little things. *Id*.  He testified that he could drive but not for long periods of time because after an hour his neck "gets a little pecked up." *Id*. at 38-39.  Plaintiff's neck pain, along with his shortness of breath, also prevents him from using a lawnmower. *Id*. at 43-44.  His primary activities consist of sitting on the porch, watching television and, occasionally, watching his young grandchildren. *Id*. at 41.

Plaintiff testified that he had not received any mental health treatment after the alleged onset date in 2010 through the date of the hearing. *Id*. at 34, 50.  He denied experiencing anxiety or depression, or experiencing symptoms such as worry, concern or distractibility, or any emotional difficulties. *Id*. at 50.  He testified that he has never been advised by a doctor to be treated for anxiety, depression, or any other emotional problem. *Id*.  He has no difficulty concentrating. *Id*. at 39.

### D.    The ALJ's Decision

On June 13, 2017, the ALJ determined that the Plaintiff was not disabled for purposes of the Act. *Id.* at 15-21. The ALJ found that the Plaintiff's alleged disability began on January 1, 2010 and that he was last insured on March 31, 2013. *Id.* at 13. In rendering his decision, the ALJ applied the five-step sequential evaluation under 20 C.F.R. § 404.1520(a).

At step one, the ALJ determined that the Plaintiff had not engaged in substantial gainful activity during the period from his alleged onset date of January 1, 2010 through the date he was last insured. *Id.* at 13. At step two, the ALJ found that the Plaintiff had two impairments, including status-post heart attack and chronic obstructive pulmonary disease. *Id.*

At steps three and four, the ALJ determined that the Plaintiff's impairments (individually or combined) do not meet or medically equal the severity of one of the listed impairments in 20 C.F.R. Part 404, Subpart P, Appendix 1. *Id.* Specifically, after considering the medical evidence, along with Plaintiff's testimony and opinion evidence, the ALJ determined that Plaintiff's medically determinable impairments, either singly or in combination, did not have a more than minimal impact on his ability to perform basic work activities before the date last insured. *Id.* at 13-16. The ALJ noted that following his heart attack in 2010, Plaintiff underwent stenting but did not require any cardiac rehabilitation or bypass surgery. *Id.* at 14. After his heart attack, the Plaintiff testified that he experienced chest pain, shortness of breath, pain in his neck, and numbness in his hands and arms. *Id.* However, the ALJ noted that the Plaintiff had no difficulty sitting or standing. *Id.* The ALJ summarized Plaintiff's treatments between August 2013 and January 2014 for various symptoms at Stony Brook Hospital. *Id.* at 15. During this time, it was noted that the Plaintiff was treated for his symptoms, and underwent a chest x-ray(s), stress test(s), and echocardiogram(s) which were normal overall. *Id.*

12

In assessing Plaintiff's asserted symptoms, the ALJ ultimately determined that "the claimant's medically determinable impairments could reasonably be expected to cause the alleged symptoms; however, the [Plaintiff's] statements concerning the intensity, persistence and limiting effects of these symptoms are not entirely consistent with the medical evidence and other evidence in the record.  Accordingly, these statements have been found to affect the claimant's ability to work only to the extent they can reasonably be accepted as consistent with the objective medical and other evidence." *Id*. at 14.

According to the ALJ, the medical records dated after January 2014 were not probative of the Plaintiff's functioning during the period at issue because that time frame was subsequent to the date the Plaintiff was last insured on March 31, 2013.  *Id*. at 15.  Nonetheless, the ALJ acknowledged that these records demonstrated the Plaintiff was diagnosed with cervical radiculopathy and carpal tunnel syndrome, but noted that there was no evidence that these conditions were established prior to his last insured date.  *Id*.  The ALJ also concluded that these medical records demonstrated that Plaintiff did not begin complaining about back pain until 2017.  *Id*.

The ALJ weighed the medical opinion evidence submitted by Dr. Shahin Shaikh and Dr. Travis Bench.  *Id*. at 15-16.  He accorded "no weight" to Dr. Shaikh's opinion because she did not begin treating the Plaintiff until after the date Plaintiff was last insured.  *Id*. at 15.  The ALJ accorded "good weight" to the opinion of Dr. Bench who treated the Plaintiff for at least 6 months and diagnosed him with coronary artery disease, chronic obstructive pulmonary disease and hypertension.  *Id*. at 16.  The ALJ noted Dr. Bench opined that the Plaintiff had no cardiac limitations.  *Id*.

13

The ALJ proceeded to list the factors, in addition to objective medical evidence, that he may consider when evaluating the severity of Plaintiff's impairment under 20 C.F.R. §§ 404.1529(c), 416.929(c). *Id.* Based on the course of treatment reflected in the record, the ALJ found that the Plaintiff's alleged disability was not supported by the non-objective medical evidence. *Id.* As to the objective medical evidence, the ALJ concluded that evidence and diagnostic testing between the alleged onset of the disability and the Plaintiff's last insured date on March 2013 also did not support the alleged disability. *Id.*

The ALJ then concluded that the Plaintiff was not disabled within the meaning of the Act. *Id.* at 17.

## III. LEGAL STANDARD

### A. Social Security Disability Standard

Under the Act, "disability" is defined as "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." 42 U.S.C. § 423(d)(1)(A). An individual is disabled when his "physical or mental impairment or impairments are of such severity that he is not only unable to do his previous work but cannot, considering his age, education, and work experience, engage in any other kind of substantial gainful work which exists in the national economy." 42 U.S.C. § 423(d)(2)(A).

The Commissioner's regulations set out a five-step evaluation process by which an ALJ determines disability. *See* 20 C.F.R. §§ 404.1520, 416.920. The analysis is summarized as follows:

> [I]f the Commissioner determines (1) that the claimant is not working, (2) that he has a 'severe impairment,' (3) that the impairment is not one [listed in Appendix 1

of the regulations] that conclusively requires a determination of disability, and (4) that the claimant is not capable of continuing in his prior type of work, the Commissioner must find him disabled if (5) there is not another type of work the claimant can do.

*Burgess v. Astrue*, 537 F.3d 117, 120 (2d Cir. 2008) (alteration in original) (quoting *Green–Younger v. Barnhart*, 335 F.3d 99, 106 (2d Cir. 2003)).  If the answer at any of the previously mentioned steps is "no," the analysis stops and the ALJ must find that the claimant does not qualify as disabled under the Act.

"The claimant has the general burden of proving ... his or her case at steps one through four of the sequential five-step framework established in the SSA regulations." *Burgess*, 537 F.3d at 128 (internal quotation marks and citations omitted).  "However, [b]ecause a hearing on disability benefits is a nonadversarial proceeding, the ALJ generally has an affirmative obligation to develop the administrative record." *Id.* (internal quotation marks omitted).  "The burden falls upon the Commissioner at the fifth step of the disability evaluation process to prove that the claimant, if unable to perform her past relevant work [and considering her residual functional capacity, age, education, and work experience], is able to engage in gainful employment within the national economy." *Sobolewski v. Apfel*, 985 F. Supp. 300, 310 (E.D.N.Y. 1997).

"The Commissioner must consider the following in determining a claimant's entitlement to benefits: '(1) the objective medical facts [and clinical findings]; (2) diagnoses or medical opinions based on such facts; (3) subjective evidence of pain or disability ...; and (4) the claimant's educational background, age, and work experience.'" *Balodis v. Leavitt*, 704 F. Supp. 2d 255, 262 (E.D.N.Y. 2001) (quoting *Brown v. Apfel*, 174 F.3d 59, 62 (2d Cir. 1999) (alterations in original)).  If the Commissioner finds a combination of impairments, the Commissioner must also consider whether "the combined effect of all of [a claimant's]

impairment[s]" establish the claimant's eligibility for Social Security benefits.  20 C.F.R.

§ 404.1523(c); *see also* 20 C.F.R. § 416.945(a)(2).

###    B.    Scope of Review

In reviewing a denial of disability benefits, the Court's function is not to review the

record *de novo*, but to determine whether the ALJ's conclusions "'are supported by substantial

evidence in the record as a whole or are based on an erroneous legal standard.'"  *Schaal v. Apfel*,

134 F.3d 496, 501 (2d Cir. 1998) (quoting *Beauvoir v. Chater*, 104 F.3d 1432, 1433 (2d Cir.

1997)); *Petrie v. Astrue*, 412 Fed. App'x 401, 403 (2d Cir. 2011) (summary order).  Substantial

evidence is defined as "'more than a mere scintilla.  It means such relevant evidence as a

reasonable mind might accept as adequate to support a conclusion.'"  *Perez v. Chater*, 77 F.3d

41, 46 (2d Cir. 1996) (quoting *Richardson v. Perales*, 402 U.S. 389, 401 (1971)).  "'To

determine whether the findings are supported by substantial evidence, the reviewing court is

required to examine the entire record, including contradictory evidence and evidence from which

conflicting inferences can be drawn.'"  *Snell v. Apfel*, 177 F.3d 128, 132 (2d Cir. 1999)

(quoting *Mongeur v. Heckler*, 722 F.2d 1033, 1038 (2d Cir. 1983)). Thus, the Court will not look

at the record "in isolation but rather will view it in light of other evidence that detracts from

it."  *State of N.Y. ex rel. Bodnar v. Sec'y of Health & Human Servs*., 903 F.2d 122, 126 (2d Cir.

1990).  A reviewing court will affirm an ALJ's decision based on "adequate findings supported

by evidence having rational probative force."  *Veino v. Barnhart*, 312 F.3d 578, 586 (2d Cir.

2002).

Conversely, a reviewing court will order remand for further proceedings when the

Commissioner failed to provide a full and fair hearing, made insufficient findings, or incorrectly

applied the applicable laws and regulations.  *See Rosa v. Callahan*, 168 F.3d 72, 82–83 (2d Cir.

1999); 42 U.S.C. § 405(g) ("The court shall have power to enter, upon the pleadings and transcript of the record, a judgment affirming, modifying, or reversing the decision of the Commissioner of Social Security, with or without remanding the cause for a rehearing."); *Scott v. Astrue*, No. 09–CV–3999, 2010 WL 2736879, at *7 (E.D.N.Y. July 9, 2010) (where the ALJ fails to discharge his affirmative obligation to develop the record when determining disability, remand may be required).

## IV.    DISCUSSION

Plaintiff argues that the decision of the Commissioner was not based upon a full and fair evaluation of the entire record. *See* Pl.'s Mem. at 10-11. In support of his motion, Plaintiff sets forth a litany of legal principles with little to no analysis as to their applicability to the instant action. *Id.* Consequently, the Court cannot determine with certainty the specific challenges the Plaintiff is attempting to make to the Commissioner's decision. Although not entirely clear, the Plaintiff appears to argue that the ALJ failed to adequately develop the record and properly weigh the Plaintiff's credibility. *Id*. at 9-11. In his cross-motion, the Commissioner argues that the ALJ's decision is legally correct and supported by substantial evidence. *See* Def.'s Mem. at 19-30. For the reasons set forth below, the Court finds that the ALJ's conclusions are supported by substantial evidence in the record as a whole.

### A.    Whether the ALJ Failed to Develop the Record

Plaintiff appears to argue that the ALJ failed to fulfill his duty to develop the record because he failed to "fully question the Plaintiff and treating physicians regarding his reaction to his impairments and the limitations realized," "re-contact" the Plaintiff's treating sources, and obtain "medical records and opinions of [the Plaintiff's] treating physicians." *Id*. at 10-11. Plaintiff also argues that the ALJ should have "obtain[ed] the records of Plaintiff's visits to the

health professionals or order[ed] a consultative examination" where the Plaintiff's "statements about being depressed and having seen a doctor and a counselor should have raised a suspicion in the [ALJ] regarding possible mental impairments." *Id*. at 10.

It is well-settled that the ALJ has an affirmative obligation to develop the record. *See Moran v. Astrue*, 569 F.3d 108, 112 (2d Cir. 2009). "Whether the ALJ has fulfilled his or her duty to develop the record is a threshold issue." *Matos v. Berryhill*, No. 13-CV-5062, 2017 WL 2371395, at *15 (S.D.N.Y. May 4, 2017), *report and recommendation adopted,* 2017 WL 2364368 (May 30, 2017). "The ALJ must seek additional evidence or clarification where the documentation from a claimant's treating physician, psychologist, or other medical source is inadequate ... to determine whether the claimant is disabled." *Matta v. Colvin*, No. 13-CV-5290, 2016 WL 524652, at *9 (S.D.N.Y. Feb. 8, 2016) (quotation marks and citation omitted). "To be sure, the ALJ's general duty to develop the administrative record applies even where the applicant is represented by counsel, but the agency is required affirmatively to seek out additional evidence only where there are 'obvious gaps' in the administrative record." *Eusepi v. Colvin*, 595 Fed. App'x 7, 9 (2d Cir. 2014) (citation omitted); *see also Cervini v. Saul*, No. 17-CV-2128, 2020 WL 2615929, at *7 (E.D.N.Y. May 21, 2020) ("[T]he flip-side of this same proposition" is that "where there are no obvious gaps in the administrative record, and where the ALJ already possesses a 'complete medical history,' the ALJ is under no obligation to seek additional information in advance of rejecting a benefits claim."). "The obligation to develop the record is enhanced when the disability in question is a psychiatric impairment." *Marinez v. Comm'r of Soc. Sec.*, 269 F. Supp.3d 207, 215 (S.D.N.Y. 2017) (internal quotation marks omitted). "However, the duty to develop the record is not absolute, and requires the ALJ only to ensure that the record contains sufficient evidence to make a determination." *Johnson v. Comm'r*

*of Soc. Sec.*, No. 17-CV-5598, 2018 WL 3650162, at *13 (S.D.N.Y. July 31, 2018) (quotation marks and citation omitted).

Here, the Court finds Plaintiff's argument that the ALJ failed to adequately develop the record to be without merit.  Plaintiff does not identify or explain (1) how the ALJ's questioning of the Plaintiff was deficient; (2) which, if any, treating sources should have been re-contacted and for what purpose; or (3) what medical opinions or treatment records regarding Plaintiff's physical impairments were not obtained by the ALJ.  Moreover, the Plaintiff does not identify any "obvious gaps" in the record triggering the ALJ's obligation to seek out additional evidence and, upon review, the Court finds none.  *See Rodriguez v. Comm'r of Soc. Sec.*, No. 19 CIV. 4351, 2020 WL 2999384, at *10 (S.D.N.Y. June 4, 2020) ("Plaintiff's conclusory allegation that the ALJ 'failed to fully inquire of the treating and examining doctors' does not persuade this Court that an obvious gap existed in the record.").

As set forth above, the ALJ had several years' worth of treatment records, as well as medical source statements from two of the Plaintiff's treating physicians.  At the outset of the December 9, 2016 hearing, the ALJ recognized that Plaintiff had provided only 104 pages of medical records, covering the period from February 2014 through July 2015, and, thus, no records for either the period prior to March 31, 2013 -- the Plaintiff's date last insured -- or the 18 months preceding the December 2016 hearing.  Tr. at 25-26.  Accordingly, the ALJ appropriately granted Plaintiff additional time to provide documents, so the record would be complete, and offered to subpoena records for the period prior to the date last insured.  Tr. at 27, 52-56.  Plaintiff's counsel stated at the hearing that he would seek records related to the Plaintiff's heart attack and from Plaintiff's cardiologist for the period beginning in 2010.  *Id*. at 26-27, 30.  Subsequently, Plaintiff's counsel wrote to the ALJ requesting that subpoenas be

issued to Stony Brook Hospital, Dr. Bench and ANP Grant. *Id*. at 238. The subpoenas were issued and the responses received from the subpoenas were admitted into the record. *Id*. at 26-31.

Based on the Plaintiff's summary of the evidence reviewed by the ALJ, it appears that the Plaintiff takes issue with the ALJ's failure to issue a subpoena for Dr. Shaikh's medical records, *See* Pl.'s Mem. at 5. However, the Court notes that the Plaintiff did not include Dr. Shaikh as among the medical providers from whom Plaintiff requested the ALJ to subpoena records. Tr. at 238. Moreover, the ALJ had no reason to conclude that medical records from Dr. Shaikh should be subpoenaed after the Plaintiff testified that the only doctor he had seen regularly during the relevant period was Dr. Bench. *Id*. at 39-40. Accordingly, there were no "obvious gaps" in the administrative record such that the ALJ was required to seek additional evidence regarding the Plaintiff's physical impairments. *See Lowry v. Astrue*, 474 Fed. App'x 801, 804 (2d Cir. 2012) (summary order) ("Although an ALJ has an affirmative duty to develop the administrative record ... where there are no obvious gaps in the administrative record, and where the ALJ already possesses a complete medical history, the ALJ is under no obligation to seek additional information in advance of rejecting a benefits claim") (internal quotation marks and citations omitted).

Similarly, there were no "obvious gaps" in the record requiring the ALJ to seek additional evidence regarding any mental impairments the Plaintiff is now contending he may have had. Although the fact that the Plaintiff did not specifically allege a mental impairment in his initial benefits applications is not dispositive as to whether the ALJ satisfied the duty to develop the record with respect to a potential mental disability, there must nonetheless be a basis from which the duty arises. *See Prentice v. Apfel*, 11 F. Supp. 2d 420, 426 (S.D.N.Y. 1998);

20

*Keller v. Colvin*, No. 16-CV-6399P, 2017 WL 4112024, at *13 (W.D.N.Y. Sept. 18, 2017).  At

the December 9, 2016 hearing, Plaintiff's counsel argued that the Plaintiff was entitled to

disability benefits based on various physical impairments, but did not mention any mental

impairments.  *See* Tr. at 27-30.  With respect to his mental health, the Plaintiff testified at the

hearing that he had not received treatment from a psychiatrist, psychologist or other mental

health professional, and that no doctor had recommended that he undergo treatment for

depression, anxiety or any other emotional problem.  *Id*. at 34, 50.  He also denied experiencing

anxiety or depression, or experiencing symptoms such as worry, concern or distractibility, or any

emotional difficulties.  *Id*. at 50.  While the January and February 2014 treatment records

provided by Stony Brook Hospital demonstrate that the Plaintiff had suicidal ideations at that

time, this incident occurred *after* the Plaintiff's last insured date.  *Id*. at 462, 948-49, 955, 975,

977-979, 1016-17, 1035.

Even if the ALJ did fail to fully develop the record, that failure would be reversible error

only if it caused Plaintiff prejudice.  *Butler v. Comm'r of Soc. Sec.*, No. 18-CV-5293, 2019 WL

4545639, at *7 (S.D.N.Y. Aug. 14, 2019), *report and recommendation adopted*, No. 18-CV-

5293, 2019 WL 4534419 (S.D.N.Y. Sept. 18, 2019) (citing *Seltzer v. Comm'r of Soc. Sec.*, No.

07-CV-0235, 2007 WL 4561120, at *10 (E.D.N.Y. Dec. 18, 2007) ("[T]o the extent that an ALJ

fails in her duty to affirmatively develop the record and/or consider all of the relevant evidence,

the court can still affirm her decision if this error is deemed to be harmless.") (collecting cases)).

Again, the only evidence which Plaintiff appears to suggest is missing from the record, with the

exception of any mental health records which the Plaintiff only now suggests exist, despite his

testimony demonstrating otherwise, are records from Dr. Shaik.  It appears that the only record

from Dr. Shaik which was omitted from the record before the ALJ was a treatment note dated

February 4, 2013.  Tr. at 64-66.  As discussed below, even if the ALJ did possess Dr. Shaikh's treatment note, the evidence would still support a finding that Plaintiff is not disabled.  The note references treatment the Plaintiff received for shortness of breath before his last insured date.  *Id*. While Dr. Shaikh diagnosed the Plaintiff as having smoking-related emphysema, shortness of breath and wheezing, she found only mild obstruction of Plaintiff's small airways.  *Id*.  Plaintiff reported no chest pain and his heart rate measured within normal limits.  *Id*.  Dr. Shaikh recommended that Plaintiff use a nebulizer, a long–acting bronchodilator and that he begin counseling to stop smoking.  *Id*.  She also noted that the Plaintiff had no neck pain or joint pain or swelling.  *Id*.  She made no statement indicating that Plaintiff's condition prevented him from any type of work.  *Id*.  Moreover*,* the treatment note dated February 4, 2013 is the only record of any treatment from Dr. Shaikh and the Plaintiff testified that he had not seen any doctor regularly prior to his date last insured with the exception of Dr. Bench.  As such, Dr. Shaikh cannot be considered a "treating physician" such that her opinion, dated more than two years after the note, should be given substantial weight.  *See Petri*, 412 Fed. App'x at 405 (the opinion of a physician who has only examined a claimant once is not entitled to the extra weight of that of a treating physician); *see also Clark v. Comm'r of Soc. Sec.*, 143 F. 3d 115, 118 (2d Cir. 1998) (factors to be considered when treating physician's opinion is not given controlling weight include: "(i) the frequency of examination and the length, nature, and extent of the treatment relationship; (ii) the evidence in support of the opinion; (iii) the opinion's consistency with the record as a whole; and (iv) whether the opinion is from a specialist").  As discussed below, the ALJ's decisions was supported by substantial evidence and, therefore, there is no basis to conclude that the ALJ erroneously failed to develop the record.  *See Rosa v. Callahan*, 168 F.3d 72, 79 n.5 (2d Cir. 1999) ("[W]here there are no obvious gaps in the administrative record, and where the ALJ

already possesses a 'complete medical history,' the ALJ is under no obligation to seek additional information....") (citation omitted).

Therefore, the Court respectfully recommends to Judge Azrack that the matter not be remanded for further development of the record.

**B.    Whether the ALJ Erred in Assessing Plaintiff's Credibility**

Plaintiff argues that the ALJ improperly discounted his subjective description of his symptoms and functional limitations. *See* Pl.'s Mem. at 9.  An ALJ evaluating a claimant's subjective complaints of his symptoms must first decide whether the claimant suffers from a medically determinable impairment that could reasonably be expected to produce his pain or other symptoms alleged.  20 C.F.R. § 404.1529(c)(1).  Second, the ALJ must evaluate the intensity and persistence of the claimant's symptoms given all of the available evidence. *Id.*  In assessing the credibility of the claimant's statements regarding his symptoms, the ALJ must consider the following factors: "(1) [The claimant's] daily activities; (2) The location, duration, frequency, and intensity of [the claimant's] pain or other symptoms; (3) Precipitating and aggravating factors; (4) The type, dosage, effectiveness, and side effects of any medication [the claimant] takes or has taken to alleviate pain or other symptoms; (5) Treatment, other than medication, [the claimant] receives or has received for relief of pain or other symptoms; (6) Any measures the claimant uses or [has] used to relieve pain or other symptoms (e.g., lying flat on [her] back, standing for 15 to 20 minutes every hour, sleeping on a board, etc.); and (7) Other factors concerning [the claimant's] functional limitations and restrictions due to pain or other symptoms."  20 C.F.R. § 404.1529(c)(3).  Notwithstanding, the ALJ will consider whether there are any incongruities between the claimant's statements and the rest of the evidence. 20 C.F.R.

§ 404.1529(c)(4).  "Remand is appropriate where an ALJ does not follow these steps." *Peck v. Astrue*, No. 07-CV-2762, 2010 WL 3125950, at *4 (E.D.N.Y. Aug. 6, 2010).

Here, the ALJ explained that "the claimant's medically determinable impairments could reasonably be expected to cause the alleged symptoms; however, the claimant's statements concerning the intensity, persistence and limiting effects of these symptoms are not entirely consistent with the medical evidence and other evidence in the record.  Accordingly, these statements have been found to affect the claimant's ability to work only to the extent they can reasonably be accepted as consistent with the objective medical and other evidence." Tr. at 14. The ALJ's decision recounted the essential points from Plaintiff's testimony and various portions of the record that did not support some of that testimony, namely, that which was related to the Plaintiff's ability to work after his heart attack.  This information includes the opinion of Dr. Bench who opined that the Plaintiff had no cardiac limitations and the treatment records arising from the Plaintiff's heart attack which the ALJ noted only required routine treatment and no cardiac rehabilitation or surgery. *Id*. at 15-16.  In fact, these treatment records stated that the Plaintiff could return to work after being seen by his cardiologist on April 28, 2010, whereas Plaintiff testified he was advised not to return to work. *Id*. at 360.

"Although the ALJ's reasoning could have been better articulated and more thorough, it is clear to the Court that the ALJ's credibility finding was amply based on the record." *Douglas v. Berryhill*, No. 17-CV-00694, 2019 WL 1017341, at *7 (E.D.N.Y. Mar. 4, 2019); *see Battaglia*, 2018 WL 1054371, at *4 ("[I]t would have made for easier review if the ALJ had written: 'I find plaintiff not credible for the following reasons,' and then listed each of the points set forth above. But most of these are in her decision, and no particular stylistic form is required to facilitate judicial review. Under these circumstances, remanding for a re-determination of credibility

24

would be a futile gesture. The ALJ's determination of credibility was amply based on the record.").  Here, remand for further clarification with respect to specific statements of the Plaintiff which the ALJ found incredible is precisely why such remand is unnecessary.  *See Cervini*, 2020 WL 2615929, at *8.  The ALJ's credibility analysis was sufficient and supported by substantial evidence in the record.  Therefore, the Court respectfully recommends to Judge Azrack that the ALJ's findings as to these issues not be disturbed.  *Id*.

### C.      Whether the ALJ's Decision is Supported by Substantial Evidence in the Record

The ALJ found that the Plaintiff had medically determinable impairments of status-post heart attack and COPD, but that these impairments were not severe during the relevant period. The Commissioner argues that this finding was supported by substantial evidence in the record. *See* Def.'s Mem. at 23-25. An impairment or combination of impairments is non-severe at step two if it does not significantly limit the claimant's physical or mental ability to do basic work activities.  20 C.F.R. § 404.1522(a).  Basic work activities are defined as the abilities and aptitudes necessary to do most jobs, including:  "(1) Physical functions such as walking, standing, sitting, lifting, pushing, pulling, reaching, carrying, or handling; (2) Capacities for seeing, hearing, and speaking; (3) Understanding, carrying out, and remembering simple instructions; (4) Use of judgment; (5) Responding appropriately to supervision, co-workers and usual work situations; and (6) Dealing with changes in a routine work setting."  20 C.F.R. § 404.1522(b).  As noted, the Plaintiff had the burden of demonstrating that his impairments significantly limited his ability to engage in any of these basic work activities. *See Diaz v. Shalala,* 59 F.3d 307, 315 (2d Cir. 1995) (citation omitted).

As the ALJ noted, the Plaintiff was treated for chest pain on April 6, 2010 and released the same day.  Tr. at 15 (citing Tr. at 350-454).  He did not require cardiac rehabilitation.  *Id*. at

15, 33-34, 40.  Further, treatment notes reflect that Plaintiff was cleared to return to work on April 28, 2010.  *Id*. at 360.  Importantly, the Plaintiff did not seek emergency room treatment again until after March 31, 2013, his date last insured.  When he went to the emergency room, in September 2013, January 2014 and February 2014, his visits were triggered by episodes of shortness of breath, substance abuse, and, on one occasion, suicidal ideation.  *Id*. at 461, 466, 481-82, 769, 786-789, 962-64.  During each of those visits, Plaintiff's cardiac function was found to be unremarkable.  *Id*. at 481-82, 461, 466, 787.  Though the Plaintiff reported chest pain during his January 2014 visit, the consulting cardiologist ruled out a cardiac event, noting a normal EKG and resolution of chest pain.  *Id*. at 461, 466.  Similarly, during his February 2014 visit, his cardiac examination was normal.  *Id*. at 784, 87.

The record indicates that the Plaintiff did not see his cardiologist, Dr. Bench, until October 8, 2014, when he underwent diagnostic catheterization related to chest tightness and dyspnea.  *Id*. at 678-743. 699, 715; *but see* Tr. 39-40 (Plaintiff stated that Dr. Bench had treated him from 2010 through 2013).  This information is consistent with Dr. Bench's July 24, 2015, medical source statement in which he reported having treated Plaintiff for only 10 months.  *Id*. at 296.

Plaintiff's treatment notes provide substantial evidence supporting the ALJ's assessment that Plaintiff's impairments were not severe during the relevant period -- neither requiring ongoing treatment nor causing more than minimal symptoms.  Although Plaintiff testified that Dr. Bench advised him not to return to his past work as a bricklayer, *id*. at 41-42, the record demonstrates that, following his treatment for chest pain on April 6, 2010, Plaintiff was advised that he could return to work on April 26, 2010.  *Id*. at 360.

Plaintiff's testimony also substantiates the ALJ's finding that his impairments prior to March 31, 3013 were non-severe. *See Simms v. Comm'r of Soc. Sec.*, 16-CV-534, 2017 WL 4286252 (E.D.N.Y. Sept. 26, 2017) (finding that the plaintiff's own testimony supported ALJ's physical determination) (citation omitted). Plaintiff testified that, following his April 2010 hospitalization, he needed medications to treat episodes of chest pain only once or twice a week. Tr. at 34. He also denied requiring significant treatment for any impairment until 2014. *Id*. at 40. Plaintiff attributed his inability to work primarily to emphysema, which was not diagnosed until September 2013, more than five months after his date last insured. *Id*. at 32-33, 613. Moreover, the Plaintiff did not stop smoking cigarettes until 2015. *Id*. at 33. While the Plaintiff reported that he had neck pain "all [his] life," he stated that his neck and arm pain did not become so severe as to require medication or treatment until 2014. *Id*. at 39. Notes from his initial neurological examination in May 2014 state that, despite his 40 year history of neck pain, Plaintiff "went on to live a productive life as a brick layer." *Id*. at 263. In December 2014, Plaintiff declined surgical treatment to address neck and arm pain, admitting that his quality of life [was] relatively good" and that he was "satisfied with his situation." *Id*. at 250, 1074.

The July 24, 2015 medical source statement provided by Dr. Bench -- to which the ALJ assigned "good weight" -- stated that, although Plaintiff had been diagnosed as having coronary artery disease, COPD and hypertension, he had no cardiac limitations. *Id*. at 16, 295-99. The ALJ also noted that in the statement, dated more than two years after the relevant period, Dr. Bench reported that he had been treating Plaintiff for six months and that he could not determine whether Plaintiff's condition would last twelve months. *Id*. The ALJ appropriately gave no weight to Dr. Shaikh's opinion, which also post-dated the relevant period, as the record supports the conclusion that she had not started treating Plaintiff *regularly* until 2014 -- *after* the relevant

period. *Id*. at 15, 291-94. *See Flanigan v. Colvin*, 21 F. Supp. 3d 285, 303-04 (S.D.N.Y. 2014) (affirming ALJ's decision to give no weight to treating source opinion that expressly stated that claimant's complaints began after the relevant period).

The Court finds that substantial evidence supports the ALJ's finding that Plaintiff's impairments before his date last insured, March 31, 2013, were not severe. As a result, the Court respectfully recommends to Judge Azrack that the ALJ's findings not be disturbed in this regard.[1] *See Flanigan*, 21 F. Supp. 3d at 303 (finding that ALJ's step-two determination "is supported by substantial evidence (or rather the absence of medical evidence during the . . . period in issue)") (citation omitted); *Jones v. Astrue*, No. 09-CV-1232, 2021 WL 1605566 at *7 (N.D.N.Y. Apr. 17, 2012), *report and recommendation adopted*, 2021 WL 1605593 (N.D.N.Y. May 8, 2012)).

## V.   CONCLUSION

For the foregoing reasons, the Court respectfully recommends to Judge Azrack that the Plaintiff's motion for judgment on the pleadings be DENIED and that Defendant's motion for judgment on the pleadings be GRANTED.

## VI.   OBJECTIONS

Pursuant to 28 U.S.C. § 636(b)(1)(c) and Rule 72 of the Federal Rules of Civil Procedure, the parties shall have fourteen (14) days from service of this Report and Recommendation to file written objections. *See* Fed. R. Civ. P. 6(a), (e). Such objections by an attorney of record shall

---

[1]      The Court need not address whether substantial evidence in the record supports the absence of a mental impairment that was severe because it does not appear that the Plaintiff expressly contends that he had any mental impairment. Plaintiff solely suggests for the first time in the instant motion that it is "possible" that the Plaintiff had a mental impairment and, consequently, the ALJ should have at least developed the record in this regard. Pl.'s Mem. at 10. This argument was addressed above in Section IV.A.

be filed with the Clerk of the Court via ECF.  Any objections by a *pro se* party shall be filed with the Clerk of the Court by overnight mail or regular mail.  **A courtesy copy of any objections filed is to be sent to the Chambers of the Honorable Joan Azrack.  Any requests for an extension of time for filing objections must be directed to Judge Azrack prior to the expiration of the fourteen (14) day period for filing objections**.  Failure to file objections will result in a waiver of those objections for purposes of appeal.  *Thomas v. Arn*, 474 U.S. 140, 155 (1985); *Beverly v. Walker*, 118 F.3d 900, 901 (2d Cir. 1997), *cert. denied*, 522 U.S. 883 (1997); *accord Savoie v. Merchants Bank*, 84 F.3d 52, 60 (2d Cir. 1996).


                                                    **SO ORDERED.**


Dated: Central Islip, New York
       March 22, 2021


                                      /s/ A. Kathleen Tomlinson
                                      A. KATHLEEN TOMLINSON
                                      U.S. Magistrate Judge